UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

ROBERT MCKINNEY,                                                          Plaintiff,

v.                                                    Civil Action No. 3:17-cv-P543-DJH

KENTUCKY DEPT. OF CORRECTIONS *et al.*,                                   Defendants.

* * * * *

## MEMORANDUM OPINION AND ORDER

Plaintiff Robert McKinney filed the instant *pro se* 42 U.S.C. § 1983 action proceeding *in forma pauperis* (Docket Number 1). The complaint is now before the Court for initial screening pursuant to 28 U.S.C. § 1915A. For the reasons stated below, the Court will dismiss some of Plaintiff's claims and allow others to proceed for further development.

## I.

Plaintiff, an inmate currently housed at the Northpoint Training Center, sues the Kentucky Department of Corrections (KDOC) and eighteen KDOC personnel. Their names and job titles as stated by Plaintiff are as follows: James Erwin, Commissioner of the Kentucky Department of Corrections; Gregory S. Howard, "Former Employee" of KDOC; Keith Helton, Acting Warden for Blackburn Correctional Complex (BCC); Charles Wilkerson, "Central Office Administrator (PREA)" of KDOC; Abby McIntire, Deputy Warden for BCC; Belinda Sanchez, Unit Classification Supervisor for BCC; Chad Hockinsmith, "Former Employee" of BCC; M. Burns, Sgt. of Internal Affairs for BCC; Jason Lotter, Adjustment Committee Officer for BCC; Jeff Hulker, "Internal Affairs (Central Office)" for KDOC; Miranda Rodgers, "Internal Affairs (Former Parole Officer)" for KDOC; John Dunn, State Wide Grievance Coordinator for KDOC; Philip A. Campbell, Administrative Section Supervisor at Kentucky State Reformatory

(KSR); Eric Sizemore, "Correctional Captain (Internal Affairs)" for BCC; Jodi Williams, Records Supervisor for KSR; Aaron Smith, KSR Warden; Anna Valentine, Deputy Warden for KSR; and John Hall, Sexual Abuse Coordinator for KSR.[1] He[2] sues each Defendant in his or her individual and official capacities.

Plaintiff alleges that he was assigned to an outside work program at the Kentucky State Penitentiary (KSP) in 2009. He states that he was assigned to live two doors down from Defendant Howard's home, where he was given duties, such as cleaning and yard work, which brought him into direct contact with Defendant Howard. Plaintiff states that he became fearful of Defendant Howard "as he started to make sexual comments, then . . . sexual demands upon him." He states, "McKinney was forced by fear and . . . threat to commit oral sodomy upon Howard, this occurred eleven (11) times within Lyon County at the Prison."[3]

According to the complaint, Plaintiff was later released to a halfway house, but he returned to prison after violating his parole in August 2011. He asserts, "Howard used his authority to have McKinney moved to the Bell County Forestry Camp (BCFC) located in Pineville, Kentucky where he had been promoted as the Warden of this facility, in order to further assault and abuse McKinney." During his incarceration there, Plaintiff was repeatedly "forced to perform oral sodomy on Howard . . . ." Plaintiff states, "Each time Howard's aggression and violence grew more intense and painful."

---

[1] Smith, Valentine, and Hall are not named as Defendants in the caption of the complaint. However, they are listed as Defendants in Section IV of the complaint where Plaintiff lists the name, job function, and address of each Defendant. The Court, therefore, considers Smith, Valentine, and Hall to be Defendants in this action.

[2] Plaintiff uses, alternatively, both male and female pronouns when referring to himself in the complaint. For ease of reference, the Court will use the male pronoun in discussing Plaintiff herein without making any assumption as to his gender identity.

[3] Plaintiff describes the alleged abuse by Defendant Howard in graphic detail which the Court will not recite for purposes of this initial screening.

In 2014, Plaintiff was again released to a half-way house. He maintains that Defendant Rogers assigned him to a halfway house for a Substance Abuse Program where he had previously had problems with a staff member and therefore worried he would again have trouble there. He states, "McKinney had no one to turn to concerning this matter. McKinney turned to Gregory Howard, for help." He states that he met with Defendant Howard in Louisville about what could be done about his assignment. Plaintiff states, "Howard told McKinney if he would go with him to a motel located down the street, he would do what he could to get that assignment changed. McKinney accompanied Howard to the motel" where Plaintiff states that he was again sexually abused by Defendant Howard. He states, "This was the last time Howard physically sexually abused him, but Miranda Rogers did, in fact change the assigned program that Plaintiff was released to . . . at Howard's request. Thus [Rogers] was intentionally and knowingly aiding him in these assaults etc."

Plaintiff reports that he was later temporarily transferred to the Luther Luckett Correctional Complex (LLCC). He states that upon arriving there he learned that Defendant Howard was now the warden of LLCC. According to the complaint, "Howard started threatening and sexually harassing McKinney at first sight, he also made the comment about 'allowing' McKinney to remain at this location for housing in the minimum security section for inmates with the intent of continuing the sexual abuse of Plaintiff." He asserts that he lived in fear of Defendant Howard and contemplated harming himself. He states that he worried that the sexual abuse would result in his death in prison "if Howard feared the plaintiff would tell someone about his assaults on Plaintiff or the information Howard had revealed about the ongoing RICO conspiracy. That is, Howard shared details of the LaGrange Wardens recycling scam, where they were profiting from recycled materials within the prison."

Plaintiff reports that he was again transferred to a halfway house. He maintains that he later was informed that Defendant Howard had been terminated from the KDOC. He states, "However, Howard was allowed to continue to reap the benefit of his retirement package due to the fact his superior LaDonna Thompson had allowed him to retire and walk way, utilizing the retirement funds paid to Howard as hush money." Plaintiff asserts that Defendant Howard received his retirement even after "Central Office I.A. investigators" discovered that Howard was involved in fraud and theft of state property. He states as follows:

> That is, the recycling company was paying Howard and other KDOC Officials by check directly into their personal banking accounts. His superiors allowed this fact to not be reported to the Commonwealth's Attorney General or the Oldham County Commonwealth's Attorney's Office, because they knew, revealing such would result in Howard implicating them as well. Based upon information and belief, this is nothing less than a continuation of criminal activity/enterprise (RICO Act Offense committed at several LaGrange Facilities of the KDOC, with complete knowledge of Justice Cabinet Supervisors etc.) and the conspirators cover up of these crimes by these Department of Corrections and Justice and Public Safety Cabinet Officials.

Plaintiff further maintains that he "was retaliated against as set forth herein, in an effort to deter Plaintiff from revealing the facts and knowledge [he] obtained regarding these matters, from Gregory Howard." He states, "Furthermore, many other Justice Cabinet Officials were, and are, constantly operating in fear, under threat of further retaliation if they involve themselves in this matter, or cooperate with plaintiff in seeking justice herein."

Plaintiff was again returned to the LLCC for failure to report to his halfway house, which he maintains was reduced from a major to a minor offense. The disciplinary write-up attached to the complaint is dated April 29, 2016. Plaintiff states that he "then initiated reporting the rape etc., of the sexual abuse he endured. This report was made at the [LLCC] . . . ." He states that LLCC officers sent emails to BCFC and KSP "to initiate the criminal and internal investigations." He states, "Plaintiff was interviewed by an investigator from [KSP] . . . for

4

almost five (5) minutes on the telephone as he asked how many times this occurred and where. This was all the information that was required from Plaintiff for his investigation." He further states, "Plaintiff was interviewed by Kentucky State Police Detective Sanu . . . . This interview was brief, lasting only a few minutes . . . . I was never contacted again by this State Police Detective." He maintains, "Plaintiff has written several requests for information regarding the conclusion of his findings without any response." He asserts that non-Defendant LLCC employees were present during these interviews.

Plaintiff reports that he was not sent back to the half-way house from where he was transferred, which KDOC policy would have required. He was instead "sent to the BCC (a more secure facility), where Howard had close relationships with staff and could direct staff's actions in retaliation against Plaintiff." Once he arrived at BCC, Plaintiff states that he was visited by a counselor from the Bluegrass Rape Crisis Center, which "is contracted through the [KDOC] Prison Rape Elimination Act (PREA) grant from the United States Department of Justice. This advocate[] works independently from the [KDOC]." Plaintiff states that he was also interviewed by the investigator from the BCFC and that the interview took place in person with the Bluegrass Rape Crisis Center counselor present. He states, "This interview was very detailed and the investigator allowed the plaintiff the time and patience required to bring forth the details of the sexual abuse. This interview was recorded and transcribed into a written transcript . . . ."

Plaintiff states that he "applied for an outside work detail as he was [in] community custody, Plaintiff submitted the application for the on the job training and the goodtime that is earned to shorten his sentence as other community custody inmates earn." According to the complaint, he was notified on June 22, 2016, that his application was denied due to the fact that he had pending disciplinary reports. However, he learned through an Open Records Request on

June 27, 2016, that he had no pending disciplinary reports. Plaintiff asserts, "Plaintiff was denied the good time awards and the training based on retaliation. Belinda Sanchez had been hired at [BCFC] by Gregory Howard and the Deputy Warden that also denied the request Abby McIntire had also worked with Gregory Howard."

Plaintiff states that also on June 27, 2016, the KSP investigator completed his report and investigation. According to the complaint, the investigator spoke with Defendant Howard who "admitted that we had e-mailed but stated he had not had sexual contact, therefore the investigation was deemed 'unsubstantiated.'" Plaintiff states that on June 28, 2016, the BCFC investigator completed his investigation and found the allegations to be "'Unsubstantiated.'"

Plaintiff asserts that he received the April 29, 2016, Disciplinary Report which caused him to be sent to LLCC "in an effort by unidentified KDOC/Justice and Public Safety Cabinet Staff to justify/facilitate returning Plaintiff to the custody" of LLCC, which had a new Warden, non-Defendant Mervin Haddix, who was "close friends, and coconspirators in an ongoing organized criminal organization within the KDOC, whom were committing thefts, frauds and other acts for profit utilizing their positions as wardens at LLCC and prior institutions." Plaintiff states that Haddix, "at the behest of Howard, accomplished the return transfer of Plaintiff to LLCC, for the purpose of obstructing the initial investigation into the rape allegations which had begun to circulate in the KDOC staff circles in LaGrange Kentucky." Plaintiff further states that on the same day he was transferred to LLCC Haddix was removed as Warden when KDOC officials "caught wind of the criminal conspiracy and attempts to obstruct justice by Haddix[]" and that he "was allowed to retire, just as Howard had, in an effort to utilize the retirement funds as hush money."

Plaintiff also alleges that he was given a reclassification on November 16, 2016, "stating I was no longer qualified for Class D housing due to the Disciplinary Reports received at [BCC], this appeal was submitted on 06/08/2016." He asserts that he was retaliated against by Defendants McIntire and Sanchez and alleges "the fact of the ongoing activity of retaliation to force Plaintiff not to pursue his report and request for assistance in the report of sexual abuse by Howard. The classification and the good time was denied for a false claim of pending disciplinary in June 22, 2016."

Plaintiff further states that Defendant Hockinsmith called Plaintiff to his office at BCC and explained that he was a PREA investigator and wanted to speak with him. According to the complaint, Defendant Hockinsmith "questioned me for more than two hours, is now believed he recorded the conversation to compound evidence against my claim against Gregory Howard, internal affairs officer entered the office as I was leaving." Plaintiff states, "Some of the content of the questions would lead an abused person to think it was possible that the two was getting a sexual gratification from the conversation as the questions became graphic in detail. This was reported to the Depart of Justice PREA Crisis Line." Plaintiff states, "Shortly after the report (recorded call), I was called to the Office once again and threatened 'if' I called that line again he would find me another place to live I would not like as much June 29, 2[0]16." Plaintiff then again called the line and "reported what he had said and that I was afraid of him, he had falsified his involvement in the investigation, he was not a PREA investigator for the investigation concerning my report, it was later discovered he had worked with Gregory Howard at an earlier date."

Plaintiff asserts that after he stated on the Department of Justice (DOJ) rape crisis line that he was going to write a letter to an "Attorney/State Representative (House Judiciary

Committee Co-Chairman) reporting the sexual abuse by an employee and thefts state employees

Howard and Mervin Haddix had committed June 29, 201[6]."[4]  According to the complaint,

Defendant Acting Warden Helton went to the legal office and took the letter.  Plaintiff states,

Defendant "Sgt. M. Burns Internal Affairs Officer presented me with a receipt on June 29,

2016."  Plaintiff reported this action to the DOJ rape crisis line "to preserve the record."  He

states, "E-mails that was circulated between Hockinsmith and acting Warden Keith Helton,

stating that the legal letter had been taken from the legal library, that Helton incorrectly states the

letter was not to be typed in the legal library . . . ."  Plaintiff asserts, "Hockinsmith stated in this

June 29, 2016 e-mail that 'he could find me a higher security level', and I reported this to the

Crisis Line Operator.  Keith Helton admits to taking the legal letter and keeping Charles

Wilkerson informed of the content of the letter."  Plaintiff further states as follows:

> Chad Hockinsmith then called me back to his office and threatened me after I had
> reported the taking of the letter on the same day, June 29, 2016 and his threats in
> the e-mail and that he had stated to me he could find me another place to live that
> I would not like as much.  That he eventually did.  I was transferred to North
> Point Training Center that had been burned to the ground just prior due to inmate
> rioting and violence.  This atmosphere is threating and dangerous for . . . non-
> violent offenders.  The only way to achieve this goal is to continue to use
> disciplinary reports to elevate Plaintiffs custody from community to medium
> custody. This exact amount of disciplinary reports needed to achieve this custody
> and Plaintiff was transferred to that facility.

Plaintiff states that he again called the DOJ rape crisis line and reported the continuation

of retaliatory action.  The operator told him to find someone who was not involved who was to

call her directly.  Plaintiff asserts that he gave the number to Defendant Sizemore who then

contacted Defendant McIntire.  He states that Defendant McIntire "retrieved the

confidential/protected phone call from the rape crisis center and provided it to the Captain.  He

then used the information she gave him to issue yet another Disciplinary Report."  He states that

---

[4] The complaint states the date as June 29, 2017.  However, it is evident that the year was actually 2016.

the Warden later removed the Disciplinary Report from the record "due to the fact the call was unlawfully retrieved, and it had listed Abby McIntire as the sorce of the information . . . ."

Plaintiff maintains that Defendant Hockinsmith told him to report to the control center and told Plaintiff that he "needed to be reviewed for possible detention (lockup) due to several pending major disciplinary reports . . . ." However, Defendant Helton determined that Plaintiff was not a flight risk, discovered there were no pending disciplinary reports, and released him to the yard. According to the complaint, Defendant Sizemore of Internal Affairs was present, and Plaintiff told him about Defendant Hockinsmith's threats, gave him the number for the rape crisis line operator, and "told him I was confused because I did not understand how Hockinsmith was aware of the content of my confidential phone calls." Plaintiff reports that he asked Defendants Helton and Sizemore to be moved from the dorm controlled by Defendant Hockinsmith but they denied his request.

Plaintiff states that the following day Defendant Hockinsmith entered a Disciplinary Report against him "for reporting that he had threatened me the day before 'that he could find me a place I would not like as much', he stated this was a lie and that I was lying to an employee when I made that report to the confidential DOJ Rape Crisis Call line[.]" According to the complaint, the Disciplinary report stated that Defendant PREA Coordinator Wilkerson had e-mailed Defendant Hockinsmith that Plaintiff had reported his actions and attached the "actual recorded confidential phone call . . . ." Plaintiff states that at the disciplinary hearing, Hockinsmith denied having Plaintiff sent to the control center to have Plaintiff reviewed for possible flight risk. However, Plaintiff asserts, "Hester had testified that this was not true and in fact the e-mail that Hockinsmith had sent him was still available." Plaintiff states that he was denied the use of the recorded phone call as evidence and denied the request to call witnesses

named in the Disciplinary Report. He asserts, "Plaintiff was found guilty to deter him from further reporting the crimes and threats against him, he was deprived of thirty (30) days good time and extend[ed] his sentence."

Plaintiff maintains that he was in fear for his life and safety and filed a criminal complaint in Fayette County and a grievance against Defendant Hockinsmith. He states, "I was called to the Administrative Office grievance Department Coordinator and told clearly that I did not want to pursue this any further if I wished to stay at BCC, therefore feeling pressured, I signed off on the grievance."

According to the complaint, Plaintiff received the reports from KSP and BCFC finding his reports of sexual abuse unsubstantiated on July 1, 2016. He states that a few days later, he "rewrote the letter to Attorney Bent Yonts" and "sent this letter out of legal mail." Plaintiff maintains that after he sent this letter, he received four additional Disciplinary Reports and was transferred to NTC.

Plaintiff states, "Plaintiff received a response letter from the Attorney and State Representative Brent Yonts, he stated he was sending a law enforcement to assist me[.]" He reports that an investigator from the Attorney General's Office arrived a few days later and that he made a report of sexual abuse and theft of state property. Plaintiff further states the following:

> The following day the Commissioner, Rodney Ballard did in fact order the entire matter to be investigated by the Internal Affairs Branch, Investigator Jeff Hulker and Miranda Rogers appeared at [NTC] to interview me, Miranda Rogers was actually involved as an earlier participate in in the request that was made to Gregory Howard changing the parole release location from St. Ann's Dismas SAP program to the desired Volunteers of America Program, she was the Parole Officer at this time for the Dismas Portland Center/she never came again in the next four meetings with Jeff Hulker.

Plaintiff next alleges that the "retaliation monitor" from KSR, Defendant Hall, met with him shortly after he arrived at KSR. He states, "Two day after the meeting, John Hall informed the Plaintiff that the Central Office told him that he was not to be monitored at this institution due to the fact central office is monitoring and investigating the situation." He continues, "Thereafter, John Hall took it upon himself to interfere with Plaintiffs effort to file grievances and the ongoing sexual abuse investigation, while conspiring with Wikerson, John Dunn and other unidentified John & Jane does, as verified within the emails."

Plaintiff states that he filed grievances but was later informed that "the grievance would not be processed at the request of 'central office.'" He stated that Defendants Hall, Campbell, Hulker, Wilkerson and Dunn made references that "Plaintiff should not be allowed to continue the exhaustion of his remedies prior to filing litigation, for the exact purpose of interfering with his ability to file a civil action due to the Prison Litigation Reform Act's requirement for further review." Plaintiff states that Defendant Valentine "issued a directive to . . . the KSR Grievance Coordinator to, not follow CPP 14.6, instead initiating a procedure not authorized by CPP 14.6, in an effort to frustrate exhaustion." He maintains that his makes exhaustion "'functionally unavailable'" to him.

Plaintiff further states that "Defendant Jodie Williams, whom is the KSR Offender Information Services Supervisor, has took it upon herself to threaten, intimidate harass and retaliate against Plaintiff, during the Open records appeal . . . ." Plaintiff states that on August 17, 2017, she threatened and attempted to intimidate him into falsifying a claim against his inmate legal aide. She threatened him with assignment to a Special Management Unit and with false disciplinary actions "for seeking redress through the grievance process and/or through the Kentucky Attorney General's Office, during the Open Records Request Appeal, to the

Attorney General." He states Defendant Williams's actions were at the direction of Defendants Valentine, Campbell, and "other unidentified John & Jane Does." Plaintiff maintains that Defendant Campbell issued a false disciplinary report against his inmate legal aide and "security staff issued Phillips a warning for assisting in this matter, in an attempt to obstruct his assistance and prevent this filing."

Plaintiff enumerates four causes of action in his complaint. He states as his first cause of action violation of the First, Fifth, Eighth, and Fourteenth Amendments under 42 U.S.C. §§ 1983, 1985, and 1986. In support, he states that the actions of Defendants were "a part of a continuing policy, procedure, protocol, custom and/or practice of Defendants of willfully obstructing justice, intentionally, deliberately retaliating, ignoring their duties to protect" him. He states that corrections employees were "ill-trained and ill-supervised, and . . . had long demonstrated their lack of qualifications to reasonably discharge their duties." He asserts, "Such conduct is the result of policies, procedures, protocols, customs and/or practices of Defendants, either written or unwritten, which are systematically applied to all persons who are sexually assaulted by staff, seeking assistance reporting such and/or seek redress through the grievance process while incarcerated in KDOC institutions."

As his second cause of action, Plaintiff states violation of the Rehabilitation Act (RA) and the Americans with Disabilities Act (ADA). He states, "Plaintiff is a handicapped individual with a disability, specifically PTSD and anxiety disorders resulting from the sexual abuse, mental and emotional distress which, have been diagnosed by KDOC/CCS medical staff. Said disabilities, substantially affects the major life activities." He further asserts as follows:

> Defendants have failed and refused to reasonably accommodate the handicaps, needs and mental disabilities of Plaintiff, so as not to exclude him from participation in, or deny him the benefits of, the state/federally-funded correctional housing, services, programs, or activities of the KDOC, and by

failing to provide treatment compliant with the standard of care, appropriate for victims of sexual violence and/or gender non-conforming individuals.

His third cause of action is a claim of negligence. In support, he states that Defendants were "negligent and grossly negligent in their treatment of Plaintiff whom had been diagnosed with gender-dysphoria; in addition to failing to protect Plaintiff from his attacker and these Defendants whom sought to retaliate; in addition to, failing to seek any medical professionals treatment . . . ."

As his fourth cause of action, Plaintiff alleges intentional infliction of emotional distress/outrage. As grounds, he states, "Defendant's intentional treatment of Plaintiff caused extreme physical injury, pain, mental and emotional distress that cannot be compensated by any other cause of action in this Complaint, and was so beyond the bound of human decency that it exemplifies the tort of outrage."

As relief, Plaintiff seeks injunctive relief and compensatory and punitive damages.

## II.

When a prisoner initiates a civil action seeking redress from a governmental entity, officer, or employee, the trial court must review the complaint and dismiss the complaint, or any portion of it, if the court determines that the complaint is frivolous or malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. *See* § 1915A(b)(1), (2); *McGore v. Wrigglesworth*, 114 F.3d 601, 604 (6th Cir. 1997), *overruled on other grounds by Jones v. Bock*, 549 U.S. 199 (2007).

In order to survive dismissal for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "[A] district court must (1) view the complaint in the light most favorable to the plaintiff and (2) take all well-pleaded factual allegations as true." *Tackett v. M & G Polymers, USA, LLC*, 561 F.3d 478, 488 (6th Cir. 2009) (citing *Gunasekera v. Irwin*, 551 F.3d 461, 466 (6th Cir. 2009) (citations omitted)). "But the district court need not accept a 'bare assertion of legal conclusions.'" *Tackett*, 561 F.3d at 488 (quoting *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555, 557).

### III.

The Court will address Plaintiff's four enumerated causes of action below. The Court notes that Plaintiff makes references to RICO, which the Court presumes are references to the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961-1968. However, he does not list RICO where he specifically identifies the causes of actions which he is asserting. The Court, therefore, does not consider the complaint as alleging a claim under RICO. Even if it did, however, RICO is concerned with "racketeering activity" and provides in § 1964(c) for a private civil action by any person injured in his business or property. As a requirement to establish standing, a plaintiff must allege "an injury to his business or property[.]" *Sharp v. Ingham Cty.*, 23 F. App'x 496, 499 (6th Cir. 2001) (citing *Holmes v. Securities Investor Prot. Corp.*, 503 U.S. 258, 258-59 (1992)). Plaintiff has not alleged injury to any business or property; thus, a RICO claim would fail. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479 (1985) (recognizing that "Section 1964(c) authorizes a private suit by '[a]ny person injured in his

business or property by reason of a violation of § 1962'"); *Lee v. Mich. Parole Bd.*, 104 F. App'x 490, 493 (6th Cir. 2004) (holding that the plaintiff "failed to state a claim for relief because he did not demonstrate any injury to his business or property, which is a prerequisite to a successful civil RICO claim"); *Ziegler v. McGinnis*, 32 F. App'x 697, 699 (6th Cir. 2002) (holding that the prisoners had "no RICO claim because they did not allege injury to business or property"); *Fleischhauer v. Feltner*, 879 F.2d 1290, 1300 (6th Cir. 1989) ("Recovery for physical injury or mental suffering is not allowed under civil RICO because it is not an injury to business or property.").

### A. 42 U.S.C. §§ 1985 and 1986

Plaintiff alleges violations of 42 U.S.C. §§ 1985 and 1986.  He does not state on which section of § 1985 he is relying.  However, none of Plaintiff's allegations indicate that § 1985(1), which pertains to preventing an officer from performing duties, would apply.

There are two clauses to § 1985(2).  The first clause addresses intimidation of parties and witnesses in federal court proceedings, which does not appear to be applicable to this case since Plaintiff makes no allegation concerning a federal proceeding.  The second clause prohibits "two or more persons [from] conspir[ing]" to interfere with state judicial proceedings "with the intent to deny any citizen the equal protection of the laws."  This clause requires a class-based animus. *Miller v. Dowagiac Police Dep't*, No. 96-2141, 1997 U.S. App. LEXIS 28739, at *16 (6th Cir. 1997).  This language requires that there be "some racial, or perhaps otherwise class-based invidiously discriminatory animus behind the conspirators' action."  *Alexander v. Rosen*, 804 F.3d 1203, 1207-08 (6th Cir. 2015) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971)). Plaintiff alleges that Defendants repeatedly retaliated against him and otherwise violated his rights because he attempted to report sexual abuse and other illegal activity by Defendant

Howard and others. He offers no factual allegations suggesting that Defendants were motivated by invidious discrimination nor does Plaintiff even state his race. Accordingly, his claim under § 1985(2) fails.

To the extent that he is alleging a conspiracy claim under § 1985(3), the Sixth Circuit has held that a viable 42 U.S.C. § 1985(3) claim must contain:

> (1) [A] conspiracy involving two or more persons (2) for the purpose of depriving, directly or indirectly, a person or class of persons of the equal protection of the laws and (3) an act in furtherance of the conspiracy (4) which causes injury to a person or property, or a deprivation of any right or privilege of a citizen of the United States.

*Johnson v. Hills & Dales Gen. Hosp.*, 40 F.3d 837, 839 (6th Cir. 1994) (citing *Hilliard v. Ferguson*, 30 F.3d 649, 652-53 (5th Cir. 1994)). A plaintiff "must also establish that the conspiracy was motivated by a class-based animus." *Johnson*, 40 F.3d at 839.

Again, Plaintiff has failed to appropriately plead the "class-based animus" element as he alleges that Defendants violated his rights because of his attempts to report sexual abuse and other illegal activity. "[A] complaint that includes conclusory allegations of discriminatory intent without additional supporting details does not sufficiently show that the pleader is entitled to relief. . . . [A section 1985] claim can survive only if [the plaintiff] pleaded facts supporting that conclusion." *Nali v. Ekman*, 355 F. App'x 909, 913 (6th Cir. 2009). Plaintiff has not pleaded any such facts.

Additionally, the alleged conspiracy must "be pled with some degree of specificity and . . . vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim." *Center for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 832 (6th Cir. 2007) (quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1538-39 (6th Cir. 1987)). Nowhere in the complaint does Plaintiff plead the "specifics" of any alleged conspiracy such as "when,

where, or how the defendants conspired." *Perry v. Se. Boll Weevil Eradication Found., Inc.*, 154 F. App'x 467, 477 (6th Cir. 2005). Plaintiff's allegations of a conspiracy are merely conclusory and unsupported by material facts, such as when, where or how so many different Defendants from different institutions all conspired together to harm him. Therefore, Plaintiff's conspiracy claims under § 1985 must be dismissed.

A cause of action under § 1986 is based on the violation of § 1985. *Bartell v. Lohiser*, 215 F.3d 550, 560 (6th Cir. 2000) (explaining that a "§ 1986 claim is derivative and conditioned on establishing a § 1985 violation"). As this Court has concluded that Plaintiff has not stated a § 1985 claim, Plaintiff's claim under § 1986 must also be dismissed.

### B. 42 U.S.C. § 1983

### 1. KDOC

To state a § 1983 claim, a plaintiff must allege that a "person" acting under color of state law deprived the plaintiff of a right secured by the Constitution or federal law. *See* 42 U.S.C. § 1983. The KDOC is a department within the Justice and Public Safety Cabinet of the Commonwealth of Kentucky. *See* Exec. Order No. 2004-730 (July 9, 2004); Ky. Rev. Stat. Ann. § 12.250. A state and its agencies are not "persons" subject to suit under § 1983. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994). Because the KDOC is not a "person" under § 1983, Plaintiff fails to state a cognizable claim against it.

Additionally, the Eleventh Amendment[5] acts as a bar to all claims for relief against the KDOC. A state and its agencies, such as the KDOC, may not be sued in federal court, regardless

---

[5]The Eleventh Amendment to the United States Constitution provides, "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

of the relief sought, unless the state has waived its sovereign immunity under the Eleventh

Amendment or Congress has overridden it. *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf &*

*Eddy, Inc.*, 506 U.S. 139, 146 (1993); *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89,

124 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978). The Commonwealth of Kentucky has

not waived its immunity, *see Adams v. Morris*, 90 F. App'x 856, 857 (6th Cir. 2004), and in

enacting § 1983, Congress did not intend to override the traditional sovereign immunity of the

states. *Whittington v. Milby*, 928 F.2d 188, 193-94 (6th Cir. 1991) (citing *Quern v. Jordan*, 440

U.S. 332, 341 (1979)).

Therefore, Plaintiff's action against the KDOC will be dismissed for failure to state a

claim upon which relief can be granted and for seeking relief from a defendant who is immune

from such relief.

## 2. Official-capacity claims

"Official-capacity suits . . . 'generally represent [] another way of pleading an action

against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 166

(1985) (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 n.55 (1978)).

Defendants are employees of institutions within KDOC. Claims brought against state employees

in their official capacities are deemed claims against the Commonwealth of Kentucky. *See*

*Kentucky v. Graham*, 473 U.S. at 166. Moreover, state officials sued in their official capacities

for monetary damages are not "persons" subject to suit under § 1983. *Will v. Mich. Dep't of*

*State Police*, 491 U.S. at 71. Further, the Eleventh Amendment acts as a bar to claims for

monetary damages against state employees or officers sued in their official capacities. *Kentucky*

*v. Graham*, 473 U.S. at 169. Therefore, Plaintiff's official-capacity claims against Defendants

for damages must be dismissed for failure to state a claim upon which relief may be granted and for seeking monetary relief from Defendants who are immune from such relief.

Upon consideration, **the Court will allow Plaintiff's official-capacity claims for injunctive relief to proceed against all Defendants**.

### 3. Individual-capacity claims

Plaintiff alleges a violation of the Fifth Amendment. However, he fails to explain how the Fifth Amendment applies to his claims. Based on the facts alleged by Plaintiff, the Court does not find that Plaintiff has a cognizable Fifth Amendment claim against Defendants. Specifically, the Court notes that to the extent Plaintiff is attempting to rely on the Due Process Clause of the Fifth Amendment, it circumscribes only the actions of the federal government. *See, e.g.*, *Sturgell v. Creasy*, 640 F.2d 843, 850 (6th Cir. 1981); *Walker v. Hughes*, 558 F.2d 1247, 1257 (6th Cir. 1977). Here, the actions of federal officials are not at issue, and the Court will dismiss the Fifth Amendment claims for failure to state a claim upon which relief may be granted.

Upon review, **the Court will allow Plaintiff's First Amendment claims for retaliation, Eighth Amendment claims for deliberate indifference to his safety, and Fourteenth Amendment claims for violation of the Due Process Clause to proceed against all of the individually named Defendants**. In allowing any claims to proceed, the Court passes no judgment on their merit or ultimate outcome.

### C. Americans with Disabilities Act and Rehabilitation Act

Title II of the ADA states as follows: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the

services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  Similarly, the RA states:

> No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a).  Plaintiff must show three elements to establish a violation of the ADA: (1) that he is a "qualified individual with a disability"; (2) that he was "excluded from participation in or denied the benefits of a public entity's services, programs, or activities"; and (3) that he was excluded or denied benefits "by reason of such disability."  *Weinreich v. Los Angeles Cty. Metro. Trans. Auth.*, 114 F.3d 976, 978 (9th Cir. 1997).  In order to establish a violation of the RA, in addition to these three elements, Plaintiff must also show that the program or activity receives federal funds.  *Burns v. City of Columbus, Dep't of Pub. Safety, Div. of Police*, 91 F.3d 836, 841 (6th Cir. 1996).

In support of these claims, Plaintiff describes his disability as "specifically PTSD and anxiety disorders resulting from the sexual abuse, mental and emotional distress."  He alleges that Defendants have failed to accommodate his handicap "so as not to exclude him from participation in, or deny him the benefits of, the state/federally-funded correctional housing, services, programs, or activities of the KDOC[.]"  However, upon review of the facts alleged by Plaintiff, the Court finds that he makes no allegation that he was denied any benefit "by reason of a disability."  Instead he claims that he was retaliated against for his efforts to report sexual abuse and fraud on the part of Defendant Howard and others, and not because of a disability.  Therefore, Plaintiff's ADA and RA claims must be dismissed for failure to state a claim upon which relief may be granted.

In addition, in support of his ADA and RA claims, Plaintiff states that Defendants have also failed "to provide treatment compliant with the standard of care, appropriate for victims of sexual violence and/or gender non-conforming individuals." Upon review, and construing the complaint broadly as the Court is required to do at this stage, **the Court will allow an Eighth Amendment claim of deliberate indifference to Plaintiff's serious mental health needs to proceed against all of the individually named Defendants**.

### D. State-law claims

Plaintiff also alleges claims of negligence, intentional infliction of emotional distress, and outrage. Upon consideration, the Court will allow Plaintiff's state-law claims to proceed for further development.

### IV.

For the reasons set forth herein, and the Court being otherwise sufficiently advised,

**IT IS ORDERED** that Plaintiff's claims under 42 U.S.C. §§ 1985 and 1986, his claims under § 1983 against KDOC and against the individually named Defendants in their official capacities for monetary damages; his claims under § 1983 for violation of the Fifth Amendment; and his claims under the Americans with Disabilities Act and the Rehabilitation Act are **DISMISSED** pursuant to 28 U.S.C. § 1915A(b)(1), (2) for failure to state a claim upon which relief may be granted and for seeking monetary relief from defendants immune from such relief.

The Clerk of Court is **DIRECTED to add Aaron Smith, Anna Valentine, and John Hall as Defendants in the docket sheet of this action**.

The Court will enter a separate Order Regarding Service and Scheduling Order to govern the claims that have been permitted to proceed.

Date:     February 12, 2018

**David J. Hale, Judge**
**United States District Court**

cc:     Plaintiff, *pro se*
          Defendants
          General Counsel, Justice & Public Safety Cabinet, Office of Legal Counsel
4415.010